FILED
2020 Jan-21  PM 01:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 2

# Huntsville Police Department Use of Force Policy

101-13

# USE OF FORCE

1. PURPOSE: To establish uniform regulations and provide guidelines regarding use of force by Sworn Personnel.

2. POLICY: Sworn Personnel will use only the degree of force that is objectively reasonable to accomplish lawful objectives and bring an incident/person under control. Nothing in this written directive will constitute justification for reckless or criminally negligent behavior amounting to an offense against persons.

3. SCOPE: This written directive is applicable to all Sworn Personnel. Sworn Personnel who have not been issued a copy of this written directive and instructed in the policies and regulations set forth herein will not be authorized to carry any lethal or less lethal weapons.

4. RESPONSIBILITY: All Sworn Personnel will be responsible for compliance with this written directive. All Sworn Supervisory personnel will be responsible for ensuring their subordinates fully understand these policies and regulations.

5. DEFINITIONS

    A. NON-DEADLY FORCE: Any physical effort used to control or restrain another, or to overcome the resistance of another, neither likely nor intended to cause death or serious physical injury.

    B. DEADLY FORCE: Force which is likely to cause death or serious physical injury, or which creates a substantial risk of causing death or serious physical injury.

    C. LESS LETHAL FORCE: Any use of force that by its very nature is not intended to, nor is it likely to cause death; however, death may result depending on its use.

    D. OBJECTIVELY REASONABLE: In determining the necessity for force and the appropriate level of force, officers shall evaluate each situation in light of the facts and circumstances he/she perceives at the time of the incident, which would likely cause a reasonable officer to act or think in a similar way under similar circumstances. The calculus of reasonableness must embody an allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving. The appropriateness of an officer's decision to use force will be based upon the totality of the circumstances as perceived by the officer in the moment the force was used. Totality of circumstances includes, but is not limited to: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others and whether he is actively resisting arrest or attempting to evade arrest by flight.

    E. SERIOUS PHYSICAL INJURY: Physical injury which creates a substantial risk of death, or which causes serious and protracted disfigurement, protracted impairment of health, or protracted loss or impairment of the function of any bodily organ.

    F.  PHYSICAL INJURY:  Impairment of physical condition or substantial pain.

    G.  INJURY: Any manifestation or COMPLAINT of physical injury to a person which requires medical attention, even though the injured party may have refused such attention.

    H.  SIMPLE FIRST AID:  Any treatment performed by a first responder or equivalent to that which would be performed by a first responder.  Treatment at a medical facility (Emergency Room) would be more than simple first aid.

    I.  LAWFUL OBJECTIVES: Those objectives which are accomplished within the constraints of law, with respect to civil rights, departmental policies and an Officer's primary responsibility to value the protection of human life above all other things.

    J.  STRIKE: Deliverance of a blow or thrust (as with the hand, knee, fist or weapon).

    K.  RESISTANCE:  Any behavior, actually occurring or reasonably perceived will occur based on the officer's training and experience, that attempts to overcome, thwart, and/or evade an officer's lawful ability to perform his/her official duties.  Types of resistance may vary from psychological intimidation to aggravated physical aggression.

    L.  IMMINENT DANGER: The threat of death or serious physical injury that is immediate, certain, and unequivocal. "Imminent" refers to conditions that are close at hand, about to happen, or impending, and may not necessarily refer to a finite period in time. The objectively reasonable perception of the officer at the moment of action is the test for determining imminence.

6.    AUTHORIZED LESS LETHAL WEAPONS

    A.  OLEORESIN CAPSICUM:  The current department approved O.C. spray carried for duty use, see Oleoresin Capsicum directive 101.24.   Supervisors, the Special Weapons and Tactics Team, and the Mobile Field Force are authorized to use the department approved fogger for tactical situations or civil disturbances.

    B.  POLICE BATON: The Department authorized baton is the Monadnock Expandable Baton. The Mobile Field Force is also authorized to use the PR-24 baton.

    C.  LESS LETHAL EXTENDED RANGE IMPACT DEVICES:  Kinetic Energy Impact Projectiles, see directive 101.13.1.

    D.  ELECTRONIC CONTROL DEVICE: Neuro-Muscular Incapacitation Device with an intended design of causing temporary incapacitation, see Written Directive 101-13-2.

7.    USE OF FORCE: GENERAL PROCEDURES

    A.   It must be stressed that the use of force is not left to the unfettered discretion of the involved officer.  This is not a subjective determination.  The use of force must be **objectively reasonable** based on the totality of the circumstances.  Specific factors that may lead to such a decision will include, but are not limited to:

    - officer's and the suspect's relative age, sex, size, skill level and strength;

- behavior and mental capacity of the suspect;
- influence of alcohol or drugs and/or pain tolerance of suspect;
- number of officers and availability of additional officers;
- number of suspects;
- location and environmental considerations;
- officer's and suspect's proximity to weapons;
- physical condition including any injuries or degree of exhaustion;
- officer's distance from the subject, reaction time; and/or
- officer's special knowledge of the suspect.

B. Officers must always be prepared to justify their actions, and establish that those actions were objectively reasonable under the circumstances.

C. Allowances must be made for the fact that officers are often forced to make split-second decisions about the amount of force that is necessary in a particular situation or circumstances that are tense, uncertain and rapidly evolving. Given that no policy can realistically predict every possible situation an officer might encounter in the field, it is recognized that each officer must be entrusted with well-reasoned discretion in determining the appropriate use of force in each incident. While it is the ultimate objective of every law enforcement encounter to minimize injury to everyone involved, nothing in this policy requires an officer to actually sustain physical injury before applying reasonable force.

D. Facts not known to officers at the time deadly force was used, no matter how compelling, cannot be considered in determining whether the involved officer acted in conformity with this policy.

E. NON-DEADLY FORCE

1. Where deadly force is not authorized, officers may use only that level of force that is objectively reasonable to bring an incident under control; more will be considered excessive force.

2. Officers are authorized to use department-approved, non-deadly force techniques and issued equipment when necessary to lawfully:

    a. Defend his/her self or others;

    b. Bring an unlawful situation safely and effectively under control;

    c. Overcome resistance or enforce compliance as quickly as possible in anticipation of and/or to prevent the escalation of resistance; or

    d. Prevent escape.

3. The preferred response to resistance and aggression is a trained technique. However, when a confrontation escalates suddenly or during a situation involving the infliction or threatened infliction of serious physical harm, an officer may use any means or device at hand to defend him/herself, as long as the force is reasonable, given the existing circumstances. The use of an untrained response, while not normally authorized, may be objectively reasonable to end the threat and survive the encounter.

F.  DEADLY FORCE

1. Officers are authorized to use deadly force to protect themselves and/or others from what is reasonably believed to be the imminent danger of death or serious physical injury; and/or

2. To prevent the escape of a suspect who the officer reasonably believes will pose a significant threat of death or serious physical injury to the officer or others.

G. "USE OF FORCE CONTINUUM" as defined herein and taught in the Huntsville Police Academy, will be a guideline to assist officers in assessing which level of control may be appropriate when confronted with resistance.  Police members may "rule out" lower control options if they believe the selected level of force would be ineffective, or inappropriate, for the circumstances.  It is **not** necessary to progress from one level of control to the next until control is gained.  The Use of Force Continuum does not replace the requirement that force must be objectively reasonable and necessary.

H. MEDICAL AID   Officers applying force through lethal or less lethal weapons will ensure that appropriate, timely medical assistance is provided to any injured person. The assistance obtained will be appropriate to the severity of the injury and the type of force or weapon used.

I. REPORTING

1. ANY use of force will be documented in the appropriate reports (i.e., arrest or case report);

2. A supervisor will be notified and respond if a suspect complains of pain that could require more than simple first aid and alleged to have been caused by an officer.  The responding supervisor shall ensure that the suspect receives the appropriate medical attention.  If the suspect is checked by medical personnel and it is determined he/she needs no further treatment, the incident should be documented in the arrest and/or case report to include the names of medical personnel and the supervisor who responded.  No further documentation will be needed;

3. A supervisor will be NOTIFIED IMMEDIATELY and will initiate an investigation (including after-action reports and/or post deadly force procedures as required by policy) when:

   a. The use of force results in injury that requires more than simple first aid or death, and/or;

   b. The use of force is at the fourth stage or higher on the "Use of Force Continuum" with the following exceptions:

      1. THIRD STAGE LEVEL   A Supervisor will be notified immediately when OC has been used.  If no injury has resulted from the use, the

        Supervisor will ensure the OC SPRAY RESTRAINT FORM is completed, and the information is documented in the arrest report. If injury has occurred from the use of OC which requires more than simple first aid, the supervisor will investigate and complete an After Action Report.

    2.     The execution of any baton technique, including striking techniques that do not result in injury which requires medical attention more than simple first aid will not require an After Action Report.

    3.     Usage of an ECD on a suspect. See Written Directive 101-13-2, Reporting Procedures, for further.

    4.     REVIEW AND ANALYSIS   Internal Affairs will conduct an annual analysis of these reports and forward any recommendations (e.g., for training or changes in policies and procedures) to the Chief of Police.

8. USE OF FORCE CONTINUUM

    A. OFFICER'S PRESENCE (**Stage 1**)

        1.     The minimum level of force an officer can apply is mere presence.

        2.     For presence to be an effective force, an officer's uniform and bearing should command respect.

    B. USE OF FORCE: VERBAL COMMANDS (**Stage 2**)

        1.     Communication skills, when properly utilized, may defuse potentially violent encounters.

        2.     It is preferable that all encounters between police members and the public are resolved without the need to apply any physical force.

    C. USE OF FORCE: EMPTY HAND TECHNIQUES (**Stage 3**)

        1.     Empty hand techniques may be used when force is necessary and escalation to a baton strike technique or deadly force is not justified.

        2.     These techniques may include but are not limited to:

            a.     PRESSURE POINT CONTROL TACTICS, UPPER BODY CONTROL HOLD, ARREST AND CONTROL TACTICS, STRATEGIC SELF-DEFENSE AND GRAPPLING TECHNIQUES, AND BOTH SOFT AND HARD  HAND TECHNIQUES:

      1. SOFT HAND:  Open hand control; grip control; upper body control hold with no loss of consciousness;  Pressure Point Control Tactics or Arrest and Control Tactics (non-striking techniques); or

      2. HARD HAND:  Hand strikes; punching movements; Pressure Point Control Tactics or Arrest and Control striking techniques; handcuffing techniques where injury is caused due to handcuffing. (The simple act of applying handcuffs to a prisoner does not constitute a use of force.)

  b. OC: Oleoresin Capsicum Aerosol Spray.

  c. ECD:  Electronic Control Device

  d. BATON RESTRAINT TECHNIQUE:

      1. Use of the baton as a restraint tool;

      2. Baton restraint techniques may be used when force is necessary to effect the movement of an uncooperative suspect in custody; and

      3. P.P.C.T., ARRCON, OC spray, and baton restraint techniques will be used as taught in Huntsville Police Academy training.

  e. All officers will be required to successfully complete P.P.C.T., Arrest and Control (ARRCON), OC and baton training and demonstrate proficiency with these tactics; **or** Strategic Self-defense and Grappling Techniques (SSGT), OC and baton training and demonstrate proficiency with these tactics.

D. USE OF FORCE: INTERMEDIATE WEAPONS (Non-lethal) (**Stage 4**)

  1. CHEMICAL AGENTS (other than OC) WHEN AUTHORIZED:  As outlined in the written directive 407-1 governing chemical agents.

  2. LESS LETHAL EXTENDED RANGE IMPACT DEVICES:  As governed in directive 101.13.1.

  3. UPPER BODY CONTROL HOLD:  This is a neck restraint which still allows physically violent subjects to breath.  It may be used to render unconscious physically violent subjects who are a serious threat to themselves, or others.  Officers will only use the Upper Body Control Hold (UBCH) technique taught by Academy or Department defensive tactics instructors.  If a suspect is rendered unconscious as a result of the application of this technique, the officer will comply with the following:

    a. Immediately handcuff the suspect;

    b. Roll the suspect onto their side and check for vital signs.  Recovery time is usually 20-30 seconds;

      c.      Paramedics will be called to respond immediately in all cases;

      d.      If cardiopulmonary resuscitation (CPR) is necessary, remove the handcuffs from behind the back to the front;

      e.      A supervisor will be advised the UBCH technique was used if the subject was rendered unconscious and he/she will respond to the scene; and

      f.      When transporting, advise all receiving officers and detention officers, who may take custody of the suspect that he/she was rendered unconscious by use of the UBCH technique.

4. **BATON:** Any strike, offensive and/or defensive in nature.

   a.  Baton strike techniques may be used when force is necessary, and:

      1. The officer reasonably believes empty hand techniques will or have failed but an escalation to deadly force is not justified;

      2. As a repelling device in crowd control situations or to ward off blows from an assailant; or

      3. In a show of force within the ranks of a Mobile Field Force in crowd control situations.

   b.  The baton strike techniques employed will be those taught in Huntsville Police Academy training.

   c.  The baton should be carried in the holder by the uniformed officer, while on duty or working an extra duty job, unless a tactical situation deems it a hindrance to officer safety.

E. **USE OF DEADLY FORCE (Stage 5)**

1. An officer may use deadly force only when he/she reasonably believes that the action is in defense of human life, including the officer's own life, or in defense of any person in imminent danger of serious physical injury. This may be done by means of:

   a.  Firearms;

   b.  Intermediate weapons applied as deadly force; and/or

   c.  Any other means available to the officer to stop the threat with due regard for the safety of innocent by-standers.

2. The use of deadly force against a fleeing suspect must meet the conditions required

    in the aforementioned statements of policy, and:

    a. An officer may use deadly force only when necessary to affect the capture or prevent the escape of a suspect if the officer reasonably believes the suspect poses a significant threat of death or serious physical injury to the officer or others. The objectively reasonable threat posed by the suspect's avoidance of capture or successful escape should outweigh the inherent danger posed by the use of deadly force.

3. Officers are generally prohibited from discharging their firearms at a moving vehicle, except in the presence of actions that create imminent danger of death or serious physical injury to the officer or another person. Discharging a firearm at a moving vehicle under these circumstances should be an action of last resort, and:

  a. Officers shall not knowingly place themselves in a position where they would be in jeopardy of being struck by a suspect vehicle or otherwise injured, or knowingly stand and/or step into the path of a vehicle, creating circumstances where the use of deadly force may be necessary;

  b. There should be no expectation that discharging a firearm at a moving vehicle will stop the movement of that vehicle;

  c. Officers should be acutely aware that the continued, uncontrolled movement of the vehicle could add to the threat of imminent danger of death or serious physical injury to the officer or other persons.

4. If feasible, a verbal warning will be given before an officer utilizes deadly force against a fleeing suspect.

5. No person, regardless of the offense, will be presumed to pose an imminent danger to life in the absence of actions that would lead an ordinary and prudent person to believe such is the case, such as a previously demonstrated threat to, or wanton disregard for human life.

6. Deadly force against a fleeing suspect who is both non-dangerous and unarmed is strictly forbidden.

7. The age or sex of the suspect will not be considered when determining whether deadly force is necessary.

8. Any discharge of a firearm by an officer other than for training or off-duty recreational purposes will be reported to a field supervisor immediately. The supervisor will respond to the scene and initiate an investigation, after action reporting and post deadly force procedures as required by policy.

9. Officers should not discharge their firearm when the officer reasonably believes an innocent person will suffer serious injury by such discharge, unless, failure to use

      deadly force would likely present more danger to innocent persons than the use of deadly force.

10. Warning shots will not be fired. However, it is understood that in a worst-case scenario the use of tactical shots, to cover or suppress fire may be necessary to protect the life of officers or others. These tactics should be used when other options are not reasonable and only to stop serious physical harm assaults or prevent the offender(s) from initiating a serious physical harm assault.

11. For maximum incapacitation and minimum danger to innocent bystanders, officers should shoot at "center body mass". However, it is understood that there can be extenuating circumstances where this is not practical. (ex: hostage situation or body armor worn by suspect)

12. Except for general maintenance, at the direction of a supervisor or for authorized training, officers will not draw or exhibit their firearm unless the officer reasonably believes it may be necessary to use deadly force.

13. Officers will not use their firearm as a battering or bludgeoning instrument, or in any other manner inconsistent with the intended design and manufacture of the firearm, except as an action of last resort in defense of the officer or another person in circumstances involving imminent danger of death or serious physical injury.

NOTE: Nothing in this directive will be construed as preventing an officer from using his/her firearm to lawfully direct a person's movements in potential defense of human life.

9. POST DEADLY FORCE PROCEDURE: The use of deadly force by an officer that results in the injury or death of another person will necessitate the following procedures be implemented. This use of deadly force includes:

A. Any discharge of firearm other than training, off-duty recreational purpose, or destruction of an injured animal as provided in this and other directives;
B. Use of intermediate weapon applied as deadly force; or

C. Any serious physical injury or death caused by an action taken by an officer (i.e., death resulting from an accident during a pursuit).

   1. OFFICER INVOLVED

     a. Handcuff or otherwise secure the suspect and any weapons that may be in the vicinity of the suspect, making sure the threat has been terminated. If it is safe to do so, the preferred method is to leave the suspect's weapon untouched;

     b. Notify Communications and give out any BOLOs and/or pertinent information;

     c. Notify supervisor immediately;

    d. Administer first aid and/or summon medical assistance, as necessary;

    e. Secure scene and witnesses until arrival of another unit;

    f. When the deadly force used is a firearm:

When it is safe to do so, the officer(s) will render the weapon safe and holster any handgun involved and/or secure long guns in the prescribed manner, where they will remain until retrieved by a member of the Crime Scene Unit or Major Crimes/IA Investigative team;

    g. Officer(s) will not make any statements to anyone other than the Major Crimes/IA Investigative team, or Chief of Police

        1. This does not prevent the employee from issuing a BOLO or informing other units and the supervisor of the status of the call. The first responding supervisor should be provided enough information to allow him/her to secure the scene and ensure the safety of all persons involved. Example: "There is one suspect shot and lying in the back of the store; the second suspect fled north through the parking lot, the second suspect is described as..."

        2. Nothing in this directive will infringe upon the officer(s) constitutional or legal rights.

2. **BACKUP UNITS:**

    a. Upon the arrival of backup officers, the responsibility for scene, suspect and witness security will be removed from the officer(s) involved in the incident;

    b. If the suspect is transported to the hospital, an officer will follow the ambulance to the hospital and remain with the suspect until released by the Major Crimes/IA team; and/or

    c. Back up units will ensure the witnesses and/or suspects are separated until they can be interviewed.

3. **FIRST SUPERVISOR ON SCENE**

    a. Ensure that the safety and security of officers and citizens has been adequately addressed and medical assistance provided where needed;

    b. Determine if there are enough officers to secure the scene, suspects and witnesses;

    c. Assign an officer to begin a log of all persons who are present at, or who have entered or exited, the crime scene;

      d.      The supervisor will ensure that no unauthorized personnel are allowed to interview the officer(s);

      e.      Have the officer(s) involved escorted from the scene by a supervisor, and taken to a secure setting, until the Major Crimes/IA Investigative team is ready to interview them;

      f.      Have the Major Crimes/IA Investigative team respond to the scene;

      g.      Ensure the Shift Commander is notified;

      h.      If the officer is able to do so, he/she should be encouraged to notify his/her family as soon as possible and let them know that he/she is alright;

      i.      If the officer is transported to the hospital, ensure another officer accompanies and remains with him/her until relieved; and

      j.      Any use of deadly force, that results in physical injury or death, which is believed to be accidental (i.e., accidental shooting or traffic accident) will require the officer(s) to undergo drug and alcohol testing per Huntsville City Personnel Policies and Procedures Manual, section 18.  This should be done with careful consideration for the officer and the traumatic event he/she has just experienced.

4.    THE SHIFT COMMANDER

      a.      Shall respond to the scene;

      b.      Shall notify the media officer;

      c.      Shall notify the appropriate command staff;

      d.      Shall establish a media staging area and handle the media until the arrival of the media officer; and

      e.      Have a member of the North Alabama Critical Incident Stress Management Team (peer support) respond to meet with the officer after he/she has completed the interview with the Major Crimes/IA Investigative team.  The officer may request which team member is contacted.

5.    IF THE OFFICER INVOLVED IS CRITICALLY OR MORTALLY WOUNDED

      a.      If the officer(s) involved are wounded and transported to the hospital, a supervisor, or the first officer on the scene, will make safe and secure the officer's weapon until retrieved by Crime Scene or a member of the Major Crimes investigative team;

    b.    If the officer is mortally wounded, the officer's weapon should be guarded and left untouched if it can be done so safely, until Crime Scene responds and processes the scene; and

    c.    If the officer is mortally wounded or unable to call, a supervisor and another officer (friend of the family, if possible) should respond to advise the family and provide transportation to the hospital.  It is recommended that the supervisor make the notification and the family friend be there for support.  The supervisor should ensure an officer is assigned to the family for security, support, control of the press and visitors, establishment of communications and related matters.

6.    MAJOR CRIMES/IA INVESTIGATIVE TEAM

    a.    The investigative team will assume control of the scene and the investigation upon arrival;

    b.    The total responsibility of the investigation will rest on the investigative team;

    c.    No weapon shall be taken from the officer(s) involved, at the scene.  A member of the Crime Scene Unit or the Investigative team will collect the weapon(s) at the Precinct or other appropriate police facility.  Another handgun will be provided by Internal Affairs and the officer must qualify with the replacement weapon within 72 hours of issuance or prior to returning to full duty;

    d.    In most cases, the officer(s) will give an initial statement to the investigative team during the interview immediately following the incident.  After the officer(s) has had two sleep cycles, the investigator and officer(s) will review the statement to determine if a supplemental statement is necessary;

7.    PSYCHOLOGICAL FITNESS

    a.    After the investigative team has completed their interview with the officer(s), they will ensure that the officer(s) has had contact with a member of the North Alabama Critical Incident Stress Management Team ("NACISMT") (peer support) prior to going home;

    b.    A member of the NACISMT will contact the officer(s) again before they are reassigned to active duty;

    c.    A member of NACISMT will make a third contact with the officer(s) approximately four weeks after the incident.  Additional contacts will be made on an as needed basis determined by the team member.  All

        conversations with the NACISMT member are confidential; however, the NACISMT member maintains the discretion of recommending more formal counseling or a stress debriefing, if they deem it necessary;

    d.    All supervisors will receive training in the signs of post-traumatic stress disorder;

    e.    The officer(s) immediate supervisor will be responsible for monitoring him/her for any signs of stress related to the incident. If the supervisor has reason to believe that stress may be disrupting the officer's job performance, he/she will document those reasons. The supervisor will then speak with the officer and document the meeting. If the supervisor still feels a problem exists then he/she will advise their chain of command and refer the officer to the Employee Assistance Program (EAP) as per the City Policy and Procedures Manual; and/or

    f.    Additional counseling will be made available by the department upon the officer's request.

8. REMOVAL FROM LINE DUTY

    A.    Any employee whose actions or use of force results in a death or serious physical injury will be offered administrative leave for up to three days or more if necessary. All administrative leave must be approved by the Chief of Police; or

    B.    The employee may return to work in an administrative duty status if they do not take administrative leave. The first scheduled working day following the incident, the officer(s) will report to the Precinct or Division Commander at a pre-designated time to receive the administrative assignment and/or instructions. During this time the officer will complete any obligations related to the incident (additional interviews, weapons qualifications, critical incident counseling…etc). The officer will not return to line-duty status until the Incident Review Board is concluded and has reached a conclusion.

9. KILLING AN ANIMAL: Killing an animal is justified when necessary for self-defense (i.e., to prevent substantial harm to the officer or another), or when the animal is so badly injured that humanity requires its relief from further suffering.

    A.    A seriously wounded or injured animal may be destroyed only after attempts have been made to solicit assistance from Animal Control and/or the owner of the animal, and then only with the approval of a supervisor. This type of incident will be recorded on a Miscellaneous Service Report; or

    B.    The destruction of vicious animals will be guided by the same rules set forth for self-defense and the defense and safety of others.

10. USE OF FORCE: POLICE CANINES

    A.    Police patrol dogs may be used:

        1.    To defend the handler or other officers or third parties from assaults which could result in serious physical injury;

        2.    To effect criminal apprehensions of those person(s) the handler has probable cause to believe committed a serious offense; and/or

        3.    In circumstances when the use of a patrol dog would prevent escalation of force in apprehending a suspect during flight, escape or concealment from police.

    B.    Police canines will be trained by U.S.P.C.A. guidelines and will be used for only the degree of force necessary to affect lawful objectives.

    C.    Specific operational guidelines are addressed in Written Directive 401-1, Use of Police Canines.