FILED

2020 Dec-29  AM 10:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **HILTON GERMANY and JONNIE BEY** | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | **Case No.:  5:18-cv-1745-LCB** |
| **v.** | ) | |
| | ) | |
| **CITY OF HUNTSVILLE, et al.,** | ) | |
| | ) | |
| **Defendants.** | | |

## MEMORANDUM OPINION AND ORDER

The plaintiffs, Hilton Germany and Jonnie Bey, filed a complaint alleging various causes of action against the City of Huntsville ("the City") and five Huntsville police officers: William Hall, Keith Wooden, Richard Flannery, Levi Sellers, and Hudson Slater.  The plaintiffs amended the complaint twice. Therefore, the operative pleading is the second amended complaint[1].  (Doc. 28). All counts of the complaint stem from the October 23, 2016 arrest of Germany. Before the Court is a motion to strike the plaintiffs' second amended complaint filed by City of Huntsville, and Officers Hall and Wooden (Doc. 31); a motion to dismiss the second amended complaint filed by Officers Flannery, Sellers, and

---

[1] Unless otherwise noted, all references to the complaint will refer to the second amended complaint.

Slater (Doc. 39); a motion for summary judgment and motion for judgment on the pleadings filed by Officer Sellers (Doc. 48); a motion for summary judgment and motion for judgment on the pleadings filed by Officer Flannery (Doc. 54); and motions for summary judgment filed by Officer Hall (Doc. 50), Officer Wooden (Doc. 52), Officer Slater (Doc. 56), and the City (Doc. 58).  The Court held oral argument on the pending motions on September 29, 2020.  In addition to hearing the arguments of counsel, the Court also reviewed the bodycam footage of the underlying incident.

## I.   Statement of Undisputed Facts[2]

On October 23, 2016, Germany placed a 911 call in which he asked for police to come to his home and remove his wife from the residence.  Germany began the call by saying, "I'm not trying to be funny.  I'm fucking serious."  (Doc. 60-26)(First 911 Call).  The dispatcher confirmed Germany's address and then asked, "Can you tell me what happened?"  *Id.*  Germany replied, "I just need a

---

[2] The entire incident that is the basis for this claim was captured on video by bodycams worn by the responding officers.  Unless otherwise noted, the Court's recitation of the facts is based on its review of all of the video footage as well as a recording of the 911 calls placed by Germany. Neither party disputes the authenticity of the video or audio footage; therefore, unless otherwise noted, these facts are not in dispute.  The recordings were conventionally filed.  *See* (Docs. 60-13 to 60-24 and 60-25 to 60-26).

police officer to come out here.  That's what I'm requesting." *Id.*  The following exchange then occurred:

> [911 Dispatcher]: Can you tell me what happened?
>
> [Germany]: No, motherfucker, I just told you what the fuck I need, right?  So that's what I need you to do.
>
> [911 Dispatcher]: My job is to ask you questions.
>
> [Germany]: I don't give a fuck about your job.  You gonna send one or not?
>
> [911 Dispatcher]: Uh, you need to tell me what's going on.
>
> [Germany]: Look man, just send a fucking police officer.  That's all I asked for.

*Id*.  Germany then hung up the phone.

A few minutes later, Germany again called 911 and spoke to a different dispatcher.  Germany identified himself, gave his address, and said that he wanted to have someone removed from his residence.  When the dispatcher asked for more information, Germany replied, "Bring a police officer.  I'm trying to restrain myself from killing anybody."  (Doc. 60-27)(Second 911 call).

Officer Hall was dispatched to the scene and was the first to arrive.  When he got there, Germany was standing in the yard in front of his house.  Hall approached and asked Germany what was going on.  Germany told Hall that he wanted his wife removed from the residence because the two had gotten into an

argument that, Germany said, had gotten physical.  Hall told Germany that because they were legally married, he could not make his wife leave the home.  Germany then responded, "Well, I'm just letting y'all know, I don't want to have no problem with someone getting killed."  (Doc. 60-14)(Hall Bodycam).   Hall then asked Germany if he had any injuries and further questioned him about what had transpired between he and his wife.  However, Germany would not provide any details and repeated his request to have Hall remove his wife from the residence.

Up to this point, the conversation between Hall and Germany had been calm.  Hall asked for Germany's name, to which he replied, "Hilton."  *Id*.  However, when Hall asked for Germany's last name, Germany immediately became irate and told Hall that he did not like to repeat himself.  Hall replied that he had never met Germany and that there was no need for Germany to be disrespectful to him.  Hall told Germany that he was there to help, but Germany then loudly shouted, "I don't give a fuck!"  *Id*.

While Hall was speaking with Germany, Bey, who was identified as Germany's mother, came out of the house and stood between the two men.  At that point, Germany turned around and walked back toward his house while shouting that Hall needed to "get the fuck up out of here."  *Id*.  At his deposition, Hall stated

4

that, after Germany's outbursts, he decided to place him under arrest for disturbing the peace[3]. (Doc. 60-4, p. 26)(Hall Deposition).[4] The video footage shows that Hall did not explicitly tell Germany that he was under arrest but instructed him to place his hands behind his back. Germany ignored the instruction and continued to walk toward his house, uttering profanity and shouting "I ain't doing shit!" (Doc. 60-14)(Hall Bodycam). Hall followed Germany to the house where Germany climbed a small set of stairs and stood next to his front door. Hall the stated, "you need to come back down here." *Id.*

In his sworn declaration, Hall stated that, based on Germany's "loud, profane, and violent language and his repeated statements that he wanted his wife out of his house, [he] was concerned that Germany's earlier threats that he might kill someone might be directed at his wife." (Doc. 60-9, p. 6). Hall further stated that he was familiar with the Huntsville Police Department's domestic violence policy, which requires officers responding to a potential domestic violence call to, among other things, "take reasonable measures to assist and/or assure the

---

[3] In the incident report that Hall prepared after the arrest, he stated that Germany was so loud that his neighbors were looking out of their windows and coming outside their homes. (Doc. 60-4, p. 26). Germany disputes that he was being loud enough for his neighbors to hear him.

[4] Citations to page numbers in depositions refer to the page numbers assigned by the court reporter in the transcript.

immediate safety of every person who may be affected. Officers will also determine what actions will be most effective in preventing future violence." (Doc. 60-1, p. 2). According to Hall, he concluded that it was important to keep Germany separate from others inside the house until the situation could be de-escalated. (60-9, p. 7).

When Germany began to walk away from Hall, Hall followed him to the front porch at which point Bey moved in front of Hall blocking him from pursuing Germany any further. Germany had climbed the stairs and was standing just outside of his door. When Hall instructed Germany to come down from his porch, Germany yelled, "I ain't going nowhere, get the fuck off my property." (Doc. 60-14)(Hall Bodycam). Germany then went just inside the house and stood behind a glass door in full view of Hall. Hall had previously used his radio to call for assistance from other officers who then began to arrive.

As noted, Bey had placed herself between Hall and Germany and was blocking Hall's access to the house. Bey began to explain to Hall that Germany had "PTSD" and was upset because he had already given his last name and other information to the 911 dispatcher. *Id.* Bey stated that Germany did not like to have to repeat information and that Hall's questions pushed Germany "from 0 to

1000." *Id*. Bey told Hall that she is unable to control Germany when he is at "that level" because of his size. *Id.* Bey stated that Germany was "out of control" and that Germany could not control himself when he was that angry. When Hall asked Bey whether there were any weapons in the house, she responded, "Not that I'm aware of." *Id.*

Bey also told Hall that Germany's wife had thrown hot grease on him. Hall then explained to Bey that, because the situation involved domestic violence, Germany needed to come outside and talk with him. Germany again shouted, "I don't give a fuck. I ain't going nowhere." (Doc. 60-14)(Hall Bodycam). Hall told Bey that Germany needed to come back outside, but Bey replied that he was "not going to do that." *Id.* Hall then told Bey that if Germany would not come out, he would have to go inside and bring him out. *Id.*

Germany never complied with Hall's instructions to come back outside the house. Instead, he turned around and retreated inside and out of Hall's view. Hall immediately proceeded to follow him inside over Bey's protests. Officers Wooden, Flannery and Slater followed him inside. Bey was briefly pinned behind the glass door and the porch rail for a few seconds as the officers entered the house. The officers trailed Germany inside and confronted him at a set of stairs

next to the kitchen. At that point, Hall instructed him to put his hands behind his back and told him that he was under arrest. Germany asked why, and Hall informed him that he was being arrested for disturbing the peace. Germany remained loudly argumentative and yelled, "It's my fucking property. I can say whatever I want." (Doc. 60-14)(Hall Bodycam). Officer Flannery then told Germany to cooperate, but Germany pointed his finger at Flannery and told him to "shut the fuck up." Germany then emphatically shouted, "I'm not about to fucking go nowhere." *Id.*

At that point, it had been approximately seven minutes since Hall first arrived on the scene. Germany had grown more agitated and showed no sign that he intended to cooperate despite Hall's continued commands that he put his hands behind his back. Officer Wooden then sprayed a chemical irritant, identified as "OC spray" into Germany's face. A struggle ensued for approximately one minute as officers attempted to put handcuffs on Germany. Germany was then wrestled to the ground where he continued to struggle until he was ultimately subdued. There is no dispute that Officer Flannery punched Germany three or four times during the altercation. Flannery stated that he believed Germany was trying to grab his gun. (Doc. 60-14)(Hall Bodycam). However, Germany disputes that he was going for

Flannery's gun, and, because of the struggle, the video footage does not clearly show one way or the other.  Officers Hall, Wooden, and Slater also admit that they struck Germany with their hands and fists during the altercation.  It is undisputed that some of these blows hit Germany in the head.  Germany alleged that one of the officers choked him during the struggle.  However, the video footage is inconclusive and shows only that an officer put Germany in a headlock in the process of taking him to the ground.  *See e.g.* (Doc. 60-14)(Hall Bodycam).

Once Germany was handcuffed, the officers called for medical assistance and attempted to take Germany outside so that they could wash the OC spray from his face.  However, Germany refused, and the officers had to lift him to his feet.  Germany was then escorted out of the house but walked under his own power.  When they approached the porch, one of the officers escorting Germany told him, "Watch your step.  Step coming."  (Doc. 60-18)(Slater Bodycam).  Germany's left foot then slipped off the porch, and his momentum carried him a few feet towards the ground.  However, his right foot remained on the porch and his left foot hit the ground.  Neither Germany nor any of the officers fell to the ground, and the videos clearly show that the officers did not throw Germany to the ground.  *See e.g.*, (Doc. 60-20)(Allen Bodycam).

During the officers' attempt to arrest Germany, Bey began to scream loudly and repeatedly stated that she needed to get inside.  Officer Sellers restrained her briefly, but she was ultimately able to pull herself free and run into the house. Bodycam footage shows that, once she pulled her arm free, Bey fell into the house. It is clear from the footage that Bey was not pushed.  *See e.g.*, (Doc. 60-19)(Sellers Bodycam).  She was later helped up by officers after Germany was subdued.

Approximately 24 hours after his arrest, Germany went to the hospital complaining of conditions related to his arrest.  The records from that visit indicate that Germany had a chief complaint of "mild pain on multiple locations" and had bruising below his right eye and on his upper extremities.  (Doc. 60-12, p. 20). Although Germany alleged in his complaint that he "blacked out" after he was pepper sprayed, the medical records reveal that he denied losing consciousness. (Doc. 60-12, p. 17).  The doctor did not perform any imaging scans and prescribed home care and a muscle relaxer.

Germany was subsequently charged with resisting arrest and disturbing the peace.  However, those charges were later dismissed, and Germany was never convicted of any crime relating to the night of October 23, 2016.

II.   **Plaintiffs' Complaint**

On October 22, 2018, Germany and Bey filed a complaint against the City and five of the officers.  In the operative complaint, Germany alleged false arrest against Officer Hall; use of excessive force against all five officers; and assault and battery against all defendants including the City.  (Doc. 28).  Bey alleged use of excessive force against Hall as well as assault and battery against Slater.  *Id.*  As will be discussed below, there is some argument as to whether the complaint asserts any other causes of action on Bey's behalf.  All of the officers are sued in their individual capacities.  The plaintiffs purport to bring their claims pursuant to 42 U.S.C. § 1983.  However, in their statement of jurisdiction, the plaintiffs also refer to "state supplemental jurisdiction."  (Doc. 28, p. 1).  The Court will discuss this further below.

### III.    Discussion

As noted, each defendant has filed a motion for summary judgment, and two officers have also filed, jointly with their motions for summary judgment, a motion for judgment on the pleadings.  There is also a motion to strike the second amended complaint and a motion to dismiss.  The Court will first address the motion to strike and the motion to dismiss.

## A. The Motion to Strike is denied because the Court contemplated the Plaintiffs' amendment in a previous order.

The City, Wooden, and Hall moved to strike the second amended complaint on the ground that it improperly added defendants and causes of action after the deadline set out in the Court's scheduling order.  (Doc. 31).  That order, which was issued on February 28, 2019, provided that "[n]o causes of action, defenses, or parties may be added."  (Doc. 23, p. 1).  The plaintiffs filed the second amended complaint on September 11, 2019, without seeking leave to amend.  Therefore, the movants say, the complaint violates the Court's scheduling order and should be stricken.

In response, the plaintiffs note that the initial complaint and the first amended complaint named fictitious defendants John Doe, Richard Doe, and Bill Doe.  The defendants moved to strike these defendants (Doc. 8), but the Court denied the motion.  (Doc. 27).  In that order, the Court agreed with the plaintiffs' contention that the Doe defendants were not fictitious parties but instead, were actual parties named fictitiously whose names could likely be ascertained through discovery.  The plaintiffs argue that because this order was issued after the February 28, 2019 scheduling order, it served as an implicit grant of leave to amend.

12

Although it would have been better practice for the plaintiffs to file a motion for leave to amend, the Court agrees with their contention that the order denying the defendants' motion to strike was an implicit grant of leave to amend.  Although not stated explicitly, the Court did contemplate that the plaintiffs would amend their complaint once the fictitiously named defendants' identities were ascertained. The Court notes that the second amended complaint largely mirrors the first amended complaint but for the substitution of Officers Flannery, Slater, and Sellers for the Doe defendants.   Bearing in mind that Rule 15(a)(2) Fed. R. Civ. P. provides that leave to amend shall be freely granted, the Court will allow the second amended complaint.  Therefore, the defendants' Motion to Strike (Doc. 31) is **DENIED**.

### B. The Motion to Dismiss is denied because the Plaintiffs adequately described Flannery, Sellers, and Slater in their initial complaint.

In their motion to dismiss (Doc. 39), Officers Flannery, Sellers, and Slater argue that the claims against them are due to be dismissed because, they said, they were not adequately described in the initial complaint so as to allow their later substitution.  As noted, the initial complaint was filed on October 22, 2018, and the events underlying this lawsuit occurred on October 23, 2016.  The movants argue that any claims filed more than two years after that date are due to be dismissed as

13

being filed outside of the applicable two-year statute of limitations.  *See Jones v. Preuit & Mauldin*, 876 F.2d 1480, 1483 (11th Cir. 1989)(The statute of limitations for actions brought under 42 U.S.C. § 1983 in Alabama is two years.).  Although the plaintiffs argue that the claims against the movants relate back to the initial complaint, the movants contend that they were not sufficiently described in that complaint so as to allow the later substitution.

As discussed in the Court's order denying the defendants' first motion to strike, fictitious party practice is not allowed in federal court.  (Doc. 27).  However, there is a limited exception to the rule that is applicable in situations where "the plaintiff's description of the defendant is so specific as to be 'at the very worst, surplusage[.]'"  *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010), quoting *Dean v. Barber*, 951 F.2d 1210, 1215-16 (11th Cir. 1992).  In the initial complaint, the plaintiffs described the Doe defendants as "officers (identities unknown at this time by the Plaintiffs) who participated in the arrest of Hilton Germany on October 23, 2016."  (Doc. 1, p. 2).  The parties disagree as to whether this description meets the specificity standard discussed above.

In their motion, the movants cite several cases in which courts have found descriptions of fictitious parties to be insufficient.  For example, the movants

compare the plaintiffs' description of the Doe defendants to the description given by the plaintiff in *Richardson*.  In that case, the plaintiff described a fictitious defendant as "John Doe (Unknown Legal Name), guard, Charlotte Correctional Institute."  598 F.3d at 738.  That defendant was alleged to have violated the plaintiff's Eighth Amendment rights by "(1) assigning him to a cell with another inmate who was known to be dangerous and who later attacked him, (2) refusing him medical treatment for 15 hours after the attack, and (3) denying his numerous grievances and requests."  *Id.* at 736.

The district court in *Richardson* dismissed the Doe defendant and the Eleventh Circuit affirmed.  In affirming the dismissal, the Eleventh Circuit held that the description given above was insufficient to identify the defendant among the many guards employed at the correctional facility.  *Id.*  The movants cite to other cases following *Richardson* in which courts have dismissed fictitiously named defendants after finding that they were not sufficiently described. However, the Court finds the plaintiffs' description in this case to be sufficient. Although the description is brief, the Court finds it distinguishable from the overly broad descriptions discussed in the cited cases.

As noted, the plaintiffs described the three Doe defendants as officers who participated in his arrest.  Had he not specified that the officers participated in his arrest and instead generally named them as Huntsville police officers who contributed to his alleged injuries, the Court would agree that the description was insufficient.  However, by describing the three Doe defendants as officers who participated in his arrest, the plaintiffs' description adequately distinguished those officers from the numerous other officers employed by the Huntsville Police Department as well as the other officers present on the night Germany was arrested.  The Huntsville Police Department's records, including incident reports and bodycam footage, allowed Germany to ascertain the Doe defendants' identities.  In fact, the arresting officers can all be seen on the bodycam footage.  Thus, the plaintiffs' description of the Doe defendants in this particular instance was sufficiently specific to put them on notice so that they could be readily identified for service of process.  *See Dean*, 951 F.2d at 1215 n. 6.  Accordingly, the plaintiffs' claims against Flannery, Sellers, and Slater relate back to the initial complaint.  As noted, that complaint was filed within two years of the alleged incident.  Consequently, the motion to dismiss (Doc. 39) is **DENIED**.

## C. Motions for Summary Judgment (Docs. 48, 50, 52, 54, 56, and 58).

All defendants have moved for summary judgment as to all of the plaintiffs' claims, and Officers Sellers and Flannery also moved for judgment on the pleadings.  According to the defendants, they are entitled to qualified immunity from the plaintiffs' claims.  The Court will address these motions as they relate to each count in the plaintiffs' complaint.

## 1.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and

draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). "[A]t the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "'Genuine disputes [of material fact] are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record.'" *Evans v. Books-A-Million*, 762 F.3d 1288, 1294 (11th Cir. 2014) (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)). "A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if the Court doubts the veracity of the evidence, the Court cannot make credibility determinations of the evidence. *Feliciano*, 707 F.3d at 1252 (citing *Anderson,* 477 U.S. at 255). However, conclusory statements in a declaration cannot by themselves create a genuine issue of material fact. *See Stein*,

881 F.3d at 857 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In sum, the standard for granting summary judgment mirrors the standard for a directed verdict. *Anderson*, 477 U.S. at 250 (citing *Brady v. Southern R. Co.*, 320 U.S. 476, 479–480 (1943)).  The district court may grant summary judgment when, "under governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party . . . .  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted).

The evidence submitted by the defendants in this case includes video footage recorded by bodycams that were worn by officers at the scene.  The Eleventh Circuit has held:

> In cases where opposing parties tell different versions of the same events, one of which is blatantly contradicted by the record—such that no reasonable jury could believe it—a court should not adopt the contradicted allegations. *Pourmoghani–Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir.2010) (per curiam)(*quoting Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)). In the context of cases involving video evidence, this Court will accept the video's depiction over the opposing party's account of the facts where the video obviously contradicts that version of the facts. *See id*.  But, even where the entire series of events is recorded, video evidence is not obviously contradictory if it fails to convey spoken words or tone, or fails to provide an unobstructed view of the events.

*See id.*

*Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011).   The bodycam footage in the present case has sound and is continuous throughout the officers' relevant interactions with the plaintiffs.   As will be discussed below, some of the plaintiffs' allegations are blatantly contradicted by the video evidence.   In those instances, the Court will not accept the contradictory assertions as being true for purposes of summary judgment.

## 2.  Qualified Immunity Standard

To receive qualified immunity, the public official carries the initial burden of demonstrating that "he was acting within the scope of his discretionary authority when the alleged wrongful acts occurred."  *Courson v. McMillan*, 939 F.2d 1479, 1487 (11th Cir. 1991).   If the defendant is not acting within the scope of his discretionary authority, he may not enjoy the benefit of qualified immunity.  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

Once it is established that the official is acting within the scope of his discretionary authority, the burden shifts to the plaintiff "to show that qualified immunity is not appropriate."  *Lee*, 284 F.3d at 1194.  The United States Supreme Court has set forth a two-part test for determining the appropriateness of a

qualified immunity defense.  *See Saucier v. Katz*, 533 U.S. 194 (2001), *receded from by Pearson v. Callahan*, 555 U.S. 223 (2009).[5]  Under *Saucier*, a court must ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Saucier*, 533 U.S. at 201.  If a constitutional right would have been violated assuming the plaintiff's version of the facts as true, the court must then determine "whether the right was clearly established."  *Id*.

While Section 1983 creates a private right of action for constitutional violations by government officials, the doctrine of qualified immunity simultaneously operates to provide a shield from liability to government officials performing discretionary functions.  *See generally Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009) (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009) ("'Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield

---

[5] In *Pearson*, the United States Supreme Court held that courts may exercise their discretion in applying the two-part test under *Saucier* in whatever order is best suited to the facts of the case. 555 U.S. at 810 ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."). The *Pearson* Court noted that cases at the pleading stage may be best suited for reordering the sequence because in the early stages of litigation, "the precise factual basis for the plaintiff's claim or claims may be hard to identify. *Id*. at 822. As the parties in the present case are beyond the pleading stage, the Court finds that the traditional application of *Saucier* is appropriate.

21

officials from harassment, distraction and liability when they perform their duties reasonably.'")).  The purpose of qualified immunity is to ensure that government officials are not required to "err always on the side of caution because they fear being sued." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (internal quotations and citations omitted).

### 3. Germany's Claims

In Count I of his complaint, Germany asserted a claim of false arrest against Officer Hall. In Counts II-VI, he alleged excessive force against all five officers. Finally, in Counts VIII-XIII, he asserted claims of assault and battery against all five officers as well as the City.  The Court will address each count in turn.

### a. Hall is entitled to qualified immunity on Germany's false arrest claim.

Section 1983 creates a private right of action for constitutional violations committed by persons acting under "color of state law." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 258 (1981); *see generally Monroe v. Pape*, 365 U.S. 167 (1961).  The statute provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.  Section 1983 is not itself a source of substantive rights; it instead provides a method for vindicating federal rights elsewhere conferred. *Baker v. McCollan*, 443 U.S. 137, 144, n. 3 (1979).

"A warrantless arrest without probable cause violates the Constitution and forms the basis for a section 1983 claim.  The existence of probable cause, however, is an absolute bar to a section 1983 action for false arrest."  *Marx v. Gumbinner*, 905 F.2d 1503, 1505–06 (11th Cir. 1990)(internal citations omitted). Probable cause exists when "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998)(*quoting Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995) ).  "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant

a reasonable belief that the suspect had committed or was committing a crime." *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

"Absent probable cause, an officer is still entitled to qualified immunity if arguable probable cause existed." *Case v. Eslinger*, 555 F.3d 1317, 1327 (11th Cir. 2009)(*citing Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002)). "An arrest without probable cause is unconstitutional, but officers who make such an arrest are entitled to qualified immunity if there was arguable probable cause for the arrest." *Jones v. Cannon*, 174 F.3d 1271, 1282 (11th Cir. 1999)(*citing Lindsey v. Storey*, 936 F.2d 554, 562 (11th Cir. 1991); *Marx v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir. 1990)). "Arguable probable cause exists if, under all of the facts and circumstances, an officer reasonably could—not necessarily would—have believed that probable cause was present." *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004)(emphasis added); *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998)("Taking the facts of the case in the light most favorable to the plaintiffs, we conclude that the EPD officers had arguable

probable cause to arrest Anderson for disorderly conduct on March 24th, that is, that the officers could reasonably have believed that Anderson's actions on that date violated Alabama's disorderly conduct statute.")(footnote omitted); *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997)("In order to be entitled to qualified immunity from a Fourth Amendment claim, an officer need not have actual probable cause but only 'arguable probable cause,' i.e., the facts and circumstances must be such that the officer reasonably could have believed that probable cause existed.").

Assessing probable cause and arguable probable cause rests upon the elements of the alleged crime and the operative fact pattern. However, determining arguable probable cause does not require proof of every element of a crime. If the arresting officer had arguable probable cause to arrest for any offense, qualified immunity will apply. *Thompson v. City of Florence*, Ala., 3:17-cv-01053-HNJ, 2019 WL 3220051, at *8 (N.D. Ala. July 17, 2019) (internal citations omitted).

In the present case, Germany has alleged that his arrest for disturbing the peace was improper because, he says, it was not based on even arguable probable

cause.  The Court disagrees.  The City of Huntsville's municipal ordinance for disturbing the peace is as follows:

> It shall be unlawful for any person willfully to disturb the peace of others by violence, offensive, boisterous or tumultuous conduct or carriage or by language calculated to provoke a breach of the peace, or to create or aid in a rout or riot within the city.

HUNTSVILLE, ALA. MUNIC. ORD. § 17-102.

It is undisputed that Germany was outside, in the corner of his yard when he began to raise his voice and shout loud profanities at Officer Hall.  Although Germany asserts that he was not yelling loudly enough for any of his neighbors to hear, that is not dispositive of the issue.  The video footage shows that Germany's behavior was not as calm and measured as he described it in the complaint.  *See* (Doc. 28, at 6)("Germany then told Hall that he could leave since he had already stated that he could be of no assistance. . . [and] quietly walked back into the privacy of his home when [Hall] told him he could not help him. . . .  Germany did not make any loud noises.").  These allegations are completely refuted by the footage from Hall's bodycam, which shows a verbal tirade that was incredibly loud and boisterous.  Germany's contention that he "did not make any loud noises" is completely false.  Rather, his behavior was so intense that Hall, or an officer in his position, could have reasonably believed that he was disturbing the peace, i.e. Hall

had, at the very least, arguable probable cause to arrest Germany.  Germany has pointed to no evidence to the contrary.  Therefore, the Court finds that Hall had at least arguable probable cause to arrest Germany thereby barring any § 1983 claim for false arrest.  *See Marx*, 905 F. 2d at 1505-06.

These facts also justify Hall's warrantless entry into Germany's home.  It is well established that certain exigent circumstances allow an officer to enter a private residence without a warrant.  One such exigency is the hot pursuit of a fleeing suspect.  *See, e.g., United States v. Santana*, 427 U.S. 38, 42-43 (1976).  Hot pursuit ensues when police pursue a suspect fleeing from a recently committed crime.  A "'hot pursuit means some sort of chase, but it need not be an extended hue and cry in and about [the] public streets.'"  *Thompson* v. C*ity of Florence*, 2019 WL 3220051, at *10, *quoting Santana*, 427 U.S. at 42-43.  This exigency applies as long as the pursuit is immediate and continuous . . . from the scene of a crime, regardless of how long the pursuit takes.  *See, e.g., United States v. Fuller*, 572 Fed. Appx. 819, 821 (11th Cir. 2014) (citation omitted).

As described above, Germany first walked away from Hall and went inside his house behind a glass door.  However, despite Hall's attempts to have Germany voluntarily come back out of the house, Germany retreated inside and out of Hall's

27

view.  Having probable cause to arrest Germany as described above, Hall was thus justified in pursuing Germany into his home.  The entry into the home was sufficiently continuous to qualify as an exigent circumstance.  Indeed, the entire sequence of events from Hall's arrival until Germany's arrest spanned less than ten minutes.

Alternatively, Hall was justified in entering the house because he intended to render emergency assistance to Germany's wife and child.[6]  Law enforcement officers may enter a house without a warrant to render emergency assistance to protect an occupant from imminent injury.  *United States v. King*, 634 Fed. Appx. 287, 290 (11th Cir. 2015).  The United States Supreme Court has recognized this exigency in the context of domestic violence:

> No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering, say, to give a complaining tenant the opportunity to collect belongings and get out safely, or to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur, however much a spouse or other co-tenant objected. . . . Thus, the question whether the police might lawfully enter over objection in order to provide any protection that might be reasonable is easily answered yes.

---

[6] Hall's bodycam revealed that Germany had previously stated that his wife and child were inside the house.

28

*Georgia v. Randolph*, 547 U.S. 103, 118 (2006).  At the time of his entry, Hall knew, based on Germany's assertions, that the situation had escalated enough to make Germany believe that someone might be killed.  Bey also informed Hall that Germany's wife had thrown hot grease on him.  Those assertions, along with Germany's aggressive behavior and abusive language, would have led any reasonable officer to be concerned for the safety of those inside the house. Accordingly, the Court finds that Hall's decision to arrest Germany for disturbing the peace was appropriate as was his decision to pursue Germany into his home in order to effect that arrest.

Germany also contended that his arrest for resisting arrest was not based on arguable probable cause.  As discussed above, there was, at the very least, arguable probable cause for Hall to arrest Germany for disturbing the peace.  "A person commits the crime of resisting arrest if he intentionally prevents or attempts to prevent a peace officer from affecting a lawful arrest of himself or of another person."  Ala. Code § 13A-10-41.  Although Germany alleged in the complaint that he "complied and did not resist arrest" (Doc. 28, at 6), the video evidence clearly shows otherwise.  After Hall told Germany that he was under arrest for disturbing the peace, Germany continued to shout profanities at the officers and

explicitly told them that he had no intention of leaving his house.  Specifically, Germany told the officers, "I'm not about to fucking go nowhere."  (Doc. 60-14)(Hall Bodycam).  A struggle then ensued for approximately one minute in which the officers had to use physical force to gain Germany's compliance.  Accordingly, the video evidence indisputably shows that Germany intentionally, through words and actions, tried to prevent his arrest.  Accordingly, there was at the very least arguable probable cause for Hall to arrest Germany for disturbing the peace, and resisting arrest.  Consequently, Hall is entitled to qualified immunity for his decision to arrest Germany.  Therefore, his motion for summary judgment (Doc. 50) as to Count I is **GRANTED**, and Count I is **DISMISSED WITH PREJUDICE**.

> **b. The officers are entitled to partial summary judgment on Germany's excessive-force claims because most of their conduct during Germany's arrest merits qualified immunity.**

Germany contends that all five officers used excessive force against him. Germany's excessive-force claims against the remaining officers are nearly identical and will be analyzed together.[7]     In cases alleging excessive force

_____

[7] In each excessive-force claim, Germany alleged that the relevant officer "did use excessive and unreasonable force against" him, which "included punching him in the face, back, and ribs."

incident to an arrest, the source of federal rights arises under the Fourth Amendment's protections against unreasonable searches and seizures. *Graham v. Connor*, 490 U.S. 386, 394 (1989)("Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right "to be secure in their persons ... against unreasonable ... seizures" of the person."); *Lee v. Ferraro*, 284 F.3d 1188, 1197–98 (11th Cir. 2002) ("The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest.").

The United States Supreme Court "has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Because the Court has determined that Germany's arrest was proper, it follows that the officers had the right to use some force. To determine whether the amount of force used by a police officer was proper, a court must ask whether a

---

(Doc. 28, p. 7-11). Germany also alleged that Officer Wooden's use of a chemical irritant was excessive and that other officers slammed him onto a concrete porch. Those allegations will be addressed separately.

reasonable officer would believe that this level of force is necessary in the situation at hand. *Kesinger v. Herrington*, 381 F.3d 1243, 1248 n. 3 (11th Cir. 2004). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation. *Id.* at 396-97.

The *Graham* factors guide this inquiry: courts consider [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396; *see also Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002). Also relevant are [4] the need for the application of force, [5] the relationship between the need and the amount of force used, and [6] the extent of the injury inflicted. *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009).

While disturbing the peace is not the most serious of crimes, Germany's behavior after Hall first told him to put his hands behind his back is another story.

In his complaint, Germany attempted to downplay his behavior by stating that he simply asked Hall to leave after it was determined that Hall would not remove his wife from the residence.  (Doc. 28, at 6).  Germany even went so far as to make the demonstrably false assertions that he made no loud noises and complied with the officers.  *Id.*  However, the video evidence described above demonstrates that Germany's behavior was severe enough to pose an immediate threat to the officers present and, potentially, to the other occupants of the house.  Indeed, Germany told both the 911 dispatcher and Hall that he was trying to prevent someone from being killed.  Thus, the second *Graham* factor weighs heavily in favor of the officers.  Further, the third *Graham* factor weighs heavily in favor of the officers because, as described above, Germany actively resisted arrest.

As to the fourth and fifth factors, the Court finds that the officers' use of hand strikes, taking Germany to the ground, and deploying a chemical irritant were proportional to the threat and reasonable in the situation confronting him.  Courts have held that such tactics are reasonable when used on a subject who is resisting arrest or refusing police requests.  *See Manners v. Cannella*, 891 F.3d 959 (11th Cir. 2018)(finding that shoving, punching in the head, and taking the plaintiff to the ground "was proportional to restrain someone who was six-foot-two and 240

pounds[8] and was actively resisting for an extended period."); *Vinyard,* 311 F.3d at 1348 ("Courts have consistently concluded that using pepper spray is reasonable, however, where the plaintiff was either resisting arrest or refusing police requests, such as requests to enter a patrol car or go to the hospital.").  As noted above, Germany explicitly told the officers that he had no intention of leaving his house.  *See e.g.* (Doc. 60-14)(Hall Bodycam).  Thus, the fourth and fifth *Graham* factors weigh in favor of the officers.  As to the final factor, Germany's medical records reveal that his injuries were minor, and required minimal treatment.  *See* (Doc. 60-12).

Having reviewed the video evidence, the Court finds that the officers were forced to quickly respond to Germany's hostile behavior and initially used a reasonable amount of force in gaining his compliance.  Accordingly, the Court finds that the officers' initial use of force, when viewed through the lens of the six factors mentioned above, was objectively reasonable under the circumstances. Thus, the officers' conduct to that point did not violate any Constitutional rights, and they are consequently entitled to qualified immunity for their actions up to that point.

---

[8] Germany's mother told Hall that Germany was six-foot-five and could not be controlled when he became angry.

34

However, Germany also alleged that the officers continued to choke and punch him after he gave up and after he was handcuffed.  (Doc. 60-11, p. 66-67)(Germany Deposition).  The Eleventh Circuit has held that  "'gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force.'" *Wate v. Kubler*, 839 F.3d 1012, 1021 (11th Cir. 2016), quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008).; *see also Lee v. Ferraro*, 284 F.3d 1188, 1200 (11th Cir. 2002) (holding that once an arrest has been fully secured and any potential danger or risk of flight vitiated, a police officer cannot employ severe and unnecessary force).  Thus, *if* the officers punched or choked Germany *after* he was subdued or handcuffed, they would not be entitled to qualified immunity.

Although the officers deny Germany's allegations, Rule 56 demands the Court view the evidence in the light most favorable to Germany.  A careful review of the evidence shows that, after the initial strikes, the spraying of the chemical irritant, and the attempt to wrestle Germany to the floor, all of the bodycam footage showing the struggle becomes difficult to make out.  Because of the physical nature of the struggle, the footage from all of the relevant cameras is shaky and does not clearly show what happened for approximately 30 seconds

35

after Germany was taken to the ground.  Further, the footage does not clearly show when Germany was handcuffed so as to allow the Court to determine whether the officers continued to strike Germany after he was subdued.  Additionally, the video footage does not show whether Germany was choked.  Viewing this evidence in the light most favorable to Germany, the Court must conclude that a genuine dispute exists as to whether the officers used excessive force in completing Germany's arrest.  Accordingly, summary judgement is due to be denied as to whether the officers are entitled to qualified immunity for their actions *after* Germany was taken to the ground as alleged in Counts II-V.[9]

However, insofar as Germany alleged that the officers violated his constitutional rights by spraying him with a chemical irritant, using hand strikes before he was taken to the ground, and wrestling him to the ground, the bodycam footage is clear that those acts were justified under the circumstances.  As detailed

---

[9] In his motion for summary judgment, Sellers asserts that his bodycam footage demonstrates that he did not touch Germany at all during the events in question.  A review of that footage shows that Sellers's bodycam was knocked off and fell to the ground as the officers entered the house.  *See* (Doc. 60-19)(Sellers's Bodycam).  That bodycam shows an officer remaining at the entrance to the house in order to prevent Bey from entering during the arrest.  However, the Court is unable to determine whether that officer is Sellers or some other unidentified officer.  Thus, the Court finds that a dispute exists as to whether Sellers was involved in the events described above.

above, the video clearly shows Germany refuse multiple requests from the officers and unequivocally state that he had no intention of complying.

Germany also alleged that Officers Wooden, Flannery, and Slater used excessive force by dragging him out of the house and "slamming him on the concrete porch."  (Doc. 28, p. 9-10).  This appears to relate to the incident described in the statement of facts in which Germany slipped while being escorted from his house.  As noted, the video evidence clearly shows that, despite the officers warning him about the upcoming stairs, Germany stumbled after a making a misstep.  However, Germany did not fall to the ground.  Further, Germany was not being dragged by the officers.  Rather, he was walking under his own power. Thus, the video evidence clearly refutes the allegation that those or any other officers dragged him from his house and "slam[ed] him on the concrete porch."  *Id.* Therefore,  summary judgment is due to be granted as to Counts III-V insofar as Germany alleged that Wooden, Flannery, and Slater slammed him on the porch or otherwise violated his constitutional rights while escorting him to the patrol car.

The Court finds it important to note the extent to which the video evidence contradicts Germany's characterization of the events in question.  In his responses to the motions, Germany attempts to compare the events of his arrest to other cases

37

in an attempt to demonstrate that the officers' conduct was unreasonable. However, in making comparisons, Germany severely downplays his behavior. For example, in his response to Hall's motion for summary judgment, Germany compares the facts of his case to *Longino v. Henry Cty. Georgia, et al.,* 791 Fed. Appx. 828 (11th Cir. 2019), an unpublished Eleventh Circuit opinion, and states that he was "somewhat verbally resistive." (Doc. 67, p. 26). Having carefully reviewed the bodycam footage, the Court finds that to be a gross understatement. In the same response, Germany attempts to argue that his resistance to the officers was because of his surprise at their presence in his house. Germany explains the events leading up to the struggle as follows: "[T]he facts of this case show that Germany, having gone into his den, came upstairs to be unexpectedly faced with four police officers in his house." *Id.* at 24-25. However, the video evidence clearly refutes this. Officer Hall told Germany that he was going to come into the house if he refused to come out. Hall and the other officers then immediately followed Germany into his house and were never more than a few feet behind him shouting instructions the entire time. Germany appears to take a few steps down the stairs but quickly turns around and confronts the officers. There was nothing unexpected about their presence in his house. Having reviewed the video

evidence, the Court finds Germany's characterization of many of the facts to be refuted.

In sum, the officers are entitled to qualified immunity for their actions prior to wrestling Germany to the ground. Sellers's, Hall's, Wooden's, Flannery's, and Slater's motions for summary judgment (Docs. 48, 50, 52, 54, and 56) are **GRANTED IN PART** as to Counts II-VI insofar as the complaint claims injuries based on that conduct. Further, Officers Wooden, Flannery, and Slater are entitled to summary judgment insofar as Germany alleged that they dragged him from the house and slammed him on the porch. Accordingly, their motions (Docs. 52, 54, and 56) are **GRANTED IN PART** on that basis. However, there is a dispute as to the officers' conduct after Germany was taken to the ground. Viewing the facts in the light most favorable to Germany, as the Court is required to do, their motions for summary judgment (Docs. 48, 50, 52, 54, and 56) are **DENIED** as to that alleged conduct.

    c.  **The officers are entitled to partial summary judgment on Germany's assault and battery claims because most of their conduct during Germany's arrest merits qualified immunity.**

In Counts IX-XIII, Germany asserted claims for assault and battery against all five officers. In their motions for summary judgment, the defendants have

analyzed these claims as if they were brought under state law.   Germany's complaint is unclear as to whether he seeks to bring these claims under state law or § 1983.   In his statement of jurisdiction, Germany purports to invoke the Court's "state supplemental jurisdiction." (Doc. 28, p. 1)  However, in the prayer for relief following all of Germany's and Bey's claims, the plaintiffs demand "judgment and punitive damages under Section 1983, in an amount to be determined ...." (Doc. 28, p. 7-17).  Given that there is no actionable claim for assault and battery under the Fourth Amendment, the Court will assume that Germany intended to bring this claim pursuant to Alabama law.

In his complaint, Germany alleged, as a basis for his assault and battery claims, that the relevant officers "did punch, kick, and slam [him] without right or cause to do so." (Doc. 28, p. 13-19).  These are essentially the same allegations that Germany alleged in claiming that the officers used excessive force. Accordingly, the Court will analyze these claims together.

In *Cantu v. City of Dothan, Alabama*, No. 18-15071, 2020 WL 5270645, at *15 (11th Cir. Sept. 3, 2020) the Eleventh Circuit held:

> "The Alabama Supreme Court has largely equated qualified immunity with [state agent] immunity." *Hunter v. Leeds*, 941 F.3d 1265, 1284 (11th Cir. 2019).  "Under both Alabama law and federal law, the core issue is whether a defendant violated clearly established

law."  *Sheth v. Webster*, 145 F.3d 1231, 1239 (11th Cir. 1998).  That means the same facts that establish an officer is not entitled to qualified immunity "also establish that [she] is not entitled to" state agent immunity.  *Hunter*, 941 F.3d at 1284.

The converse also holds true.  Therefore, summary judgment as to Counts IX-XIII is due to be granted in part and denied in part for the reasons discussed in the previous subsection.  Thus, Sellers's, Hall's, Wooden's, Flannery's, and Slater's motions for summary judgment (Docs. 48, 50, 52, 54, and 56) are **GRANTED IN PART AND DENIED IN PART** as to Counts IX-XIII for the reasons discussed above.

### d. The City is entitled to summary judgment on Germany's assault and battery claim because it is immune from tort liability arising from its officers' conduct.

In Count VIII of his complaint, Germany alleged a claim of assault and battery against the City.  For the reasons stated in the previous subsection, it is unclear whether Germany intends to bring this claim under § 1983 or state law.  However, for the reasons described above, the Court will treat Count VIII as if it asserted a state law cause of action.[10]

_____

[10] As noted in the City's response, Germany has not stated a § 1983 claim against the City because he did not plead or prove the existence of a policy or custom that was the moving force behind any constitutional violation.  (Doc. 59, p. 3)(*citing Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

With respect to the City's individual police officers, Ala. Code § 6-5-338(a) provides in relevant part as follows:

> Every peace officer . . . who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as a peace officer . . . by the state or a county or municipality thereof, . . . and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate . . . the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

Ala. Code § 6-5-338(a).  As determined in the previous sections, the officers in this case were performing discretionary functions within the scope of their duties. Additionally, the officers are entitled to immunity for their actions before the point at which they wrestled Germany to the ground.  However, as noted above, there is a dispute as to whether the officers are entitled to qualified immunity for their conduct after taking Germany to the ground.

Where an officer, including a municipal police officer, is entitled to immunity from tort liability under Ala. Code § 6-5-338(a), the statute extends this same immunity to the municipality for whom that officer works.  *See* Ala. Code § 6-5-338(b) ("This section is intended to extend immunity only to peace officers

and governmental units or agencies authorized to appoint peace officers.")(emphasis supplied). Thus, "[i]t is well established that, if a municipal police officer is immune pursuant to § 6–5–338(a), then, pursuant to § 6–5–338(b), the city by which he is employed is also immune." *Ex parte City of Tuskegee*, 932 So. 2d 895, 910 (Ala. 2005) (quotation omitted).   Accordingly, the immunity extended to the officers in this case described above also extends to the City, and summary judgment is due to be granted in its favor for the same reasons. However, summary judgment is due to be denied on this basis as to Germany's claims regarding the officers' conduct after taking him to the ground.

However, the City is entitled to immunity on another ground.  In its motion, the City also argues that it is entitled to immunity under Ala. Code § 6-5-338(a), and by operation of Ala. Code § 11-47-190, which provides that "[n]o city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through the neglect, carelessness, or unskillfulness of some agent, officer, or employee of the municipality engaged in work therefor and while acting in the line of his or her duty…."   The Alabama Supreme Court has interpreted that section as "absolve[ing] a city from liability for an intentional tort committed by one of its

agents." *Ex parte City of Gadsden*, 718 So. 2d 716, 721 (1998). *See also Brown v. City of Huntsville*, 608 F.3d 724, 743 (11th Cir. 2010)("In sum, under § 11-47-190, a city is liable for negligent acts of its employees within the scope of their employment, but not intentional torts of its employees.").

Although the City denies that its officers used excessive force or committed any other tort, it maintains that all of the officers' actions were intentional, not negligent. Indeed, the bodycam footage and officer testimony established that each of the officers involved in Germany's arrest acted intentionally, rather than negligently or carelessly. There is no dispute that Officer Wooden intentionally deployed his OC spray on Germany and that he did so in compliance with HPD policy. *See, e.g.*, (Doc. 60-5, p. 12)(Wooden Deposition)("I used OC spray in order to control the situation."). There is no dispute that Officer Hall intentionally used palm strikes on Germany to gain his compliance. *See, e.g.*, Doc. 60-9, p. 42-43)(Hall Deposition). There is no dispute that Officer Wooden intentionally struck Germany to gain his compliance. *See, e.g.*, (Doc. 60-5, p. 14-16)(Wooden Deposition). There is no dispute that Officer Slater intentionally struck Germany's torso to gain his compliance. *See, e.g.*, (Doc. 60-7, ¶ 6)(Slater Declaration). There is no dispute that Officer Flannery intentionally struck Germany, not just to gain

Germany's compliance but also because he felt his gun move and believed that Germany was attempting to take it from him. *See, e.g*., (Doc. 60-6, p. 18-19, 26)(Flannery Deposition).  And there is no dispute that the officers intentionally took Germany to the ground for the purpose of effecting his arrest. *See, e.g*., (Hall Bodycam).

In his response to the City's motion, Germany contends that the officers were acting in a negligent or unskillful manner by referencing the allegation in his complaint that the officers "performed their actions in an unskillful manner when they assaulted and battered" the plaintiffs.  (Doc. 70, p. 6), quoting (Doc. 28, p. 12).  However, Germany failed to point to actual evidence in the record that would refute the City's contention that the officers acted intentionally.  A plaintiff's mere allegations in a pleading, without more, are insufficient to survive summary judgment. *See, e.g., Levin v. Palm Beach County*, 752 Fed. Appx. 734, 739-40 (11th Cir. 2018) (quotation omitted)("[C]onclusory allegations [are] not sufficient to oppose a motion for summary judgment."); *Miles v. Celadon Group, Inc*., 382 F. Supp. 3d 1246, 1248 (N.D. Ala. 2019)(noting that party seeking to oppose summary judgment "may not merely rest on his pleadings").

Furthermore, the dispute in this case is not whether the officers' acts were intentional or negligent.  The question is whether, once Germany was handcuffed or subdued, the officers acted at all.  Germany says he was unlawfully kicked, choked, and punched after being handcuffed; the officers deny this.  Accordingly, the City is entitled to immunity from the officers' actions under Ala. Code § 11-47-190, and summary judgement is granted in its favor as to Count VIII.  Therefore, the City's motion for summary judgment (Doc. 58) is **GRANTED**, and Count VIII is **DISMISSED WITH PREJUDICE**.

### 4. Hall is entitled to summary judgment on Bey's excessive-force claim because the video evidence shows he did not act as Bey alleges.

In Count VII of the complaint, Bey alleged that Officer Hall used excessive force when he "knock[ed] [her] to the floor to come into her home without a warrant or any exigent circumstances."  (Doc. 28, p. 11).  Bey asserted that she was not suspected of a crime, was lawfully at her residence, and that no use of force was warranted against her.  However, as has already been determined, exigent circumstances existed allowing Hall and the other officers to enter the home without a warrant.  Further, the video evidence clearly refutes Bey's contention that Hall knocked her to the ground.  *See* (Doc. 60-19)(Sellers

Bodycam).  Rather, Hall merely opens the glass door to enter the house in pursuit of Germany.  The door in turn briefly pinned Bey against the porch rail.  At no point did Hall knock Bey to the ground.  Because the video evidence clearly refutes this contention, summary judgment is granted as to Count VII.  *See Logan v. Smith*, *supra*.  Accordingly, Hall's motion for summary judgment (Doc. 50) is **GRANTED IN PART** insofar as it pertains to Count VII, and Count VII is **DISMISSED WITH PREJUDICE**.

> **5. Slater is entitled to summary judgment on Bey's assault and battery claim because the video evidence shows he did not knock her down, and his other conduct is protected through qualified immunity.**

In Count XIV of the complaint, Bey alleged assault and battery against Officer Slater.  According to Bey, Slater "did rudely and offensively touch Bey without permission nor right to do so," and Slater "knock[ed] her down without right or cause to do so."  (Doc. 28, p. 16).  Again, the bodycam footage clearly refutes Bey's contention that Slater knocked her to the ground.

As to whether Slater "rudely and offensively touch[ed]" Bey, the footage shows that he made contact with her for a few seconds as he passed her in order to follow Hall and another officer into the house.  It is clear from the video that this *de minimis* amount of force used by Slater was incidental and necessary to assist

the other officers in arresting Germany.  Thus, the force was applied while Slater was performing a discretionary function and in no way violated any of Bey's constitutional rights.  Accordingly, summary judgment is due to be granted as to Count XIV.  Consequently, Slater's motion for summary judgment (Doc. 56) is **GRANTED IN PART** insofar as it pertains to Count XIV, and Count XIV is **DISMISSED WITH PREJUDICE**.

> **6. Wooden, Flannery, and Sellers are entitled to summary judgment on Bey's assault and battery claim because Bey's allegations are directly controverted by video evidence.**

Bey also contends that she properly asserted assault and battery claims against Officers Wooden, Flannery, and Sellers in Counts X, XI, and XIII respectively.  Although the headings for each of those counts reference only Germany, the body of each count alleges that the relevant defendant "did shove Bey without right to do so."  *See e.g.*, (Doc. 28, p. 14).  Assuming, without deciding, that the inclusion of that single allegation in each count suffices to state a separate claim, the Court still finds that the officers are entitled to summary judgment.  Like Slater, Officers Wooden, Flannery, and Sellers followed Hall into the house in order to arrest Germany.  The video footage clearly shows that none

of the officers shoved Bey.  The footage does show an officer[11] holding Bey's arm in an attempt to keep her from entering the house while Germany was being arrested.  (Doc. 60-19)(Sellers Bodycam); (Doc. 60-22)(Matthewson Bodycam). However, after a few seconds, Bey jerks her arm free and falls into the house.  It is clearly seen that her own momentum caused her to fall and that no officer pushed or shoved her.  Because the video footage clearly refutes her allegations, Bey is entitled to no relief, and summary judgment is granted in favor of all defendants as to her claims.  *See Logan v. Smith*, *supra*.  Accordingly, Sellers's, Wooden's, and Flannery's motions for summary judgment (Docs. 52, 54, and 48) are **GRANTED IN PART** insofar as they relate to Bey's assault and battery claims.

## IV. Motions for Judgment on the Pleadings (Docs. 48 and 54)

As noted above, Officers Sellers and Flannery contemporaneously moved for a judgment on the pleadings in their motions for summary judgment.  (Docs. 48 and 54).  However, both officers' motions for judgment on the pleadings are based on their contention that the second amended complaint does not relate back to the initial complaint and, consequently, fails to state a claim within the applicable statute of limitations.  However, for the above-stated reasons denying the motion to

---

[11] The officer holding Bey's arm just before she falls appears to be Officer Matthewson. Mathewson is not a defendant in this case.

strike the second amended complaint, Officers Sellers's and Flannery's motions (Docs. 48 and 54) are **DENIED** insofar as they seek judgment on the pleadings

## V.   Conclusion

For the foregoing reasons, the motion to strike the second amended complaint (Doc. 31) is **DENIED**; the motion to dismiss the second amended complaint (Doc. 39) is **DENIED**; the motion for summary judgment filed by the City (Doc. 58) is **GRANTED**; and the remaining motions for summary judgment (Docs. 48, 50, 52, 54, and 56) are **GRANTED IN PART AND DENIED IN PART** as explained above.  Insofar as Officers Sellers's and Flannery's motion for summary judgment also moves for judgment on the pleadings (Doc. 48 and 54), those motions are **DENIED**.

**DONE** and **ORDERED** December 29, 2020.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE